Right. We have reassembled. The next case for argument is National Association of Industrial Bankers v. Weiser. It is docket 24-1293. Counsel, please proceed when you're ready. Good morning, Your Honors. May it please the Court. Brian Urenkar on behalf of Defendant Philip Weiser. I'm here to speak on behalf of the Defendant Philip Weiser and Martha Fulford. We're here today because the banks want to deny states rights given to them by Congress. Congress added an opt-out to DITA to preserve one of the state's oldest police powers, the ability to regulate interest charged to its citizens. But the banks want this Court to render that right meaningless by reading into the opt-out language that just isn't there. The bank's interpretation robs the states of one of its oldest police powers, creating a race to the bottom where banks will move to gaps so they can charge vulnerable Coloradans triple-digit interest rates, creating an absurd result where the only thing a state cannot regulate is the interest rate charged to its citizens, even though it could before DITA and still does for non-bank lenders. The opt-out's language doesn't support this result. So first, I want to talk about flaws in the district court's interpretation of DITA and the opt-out. Second, I want to talk about why the bank's arguments don't save the district court's opinions. And then finally, I want to discuss some of the practical problems with the district court's rulings. Counsel, I'm sorry. I know you have a good agenda there. But before we get to that, can I talk to you about the cause of action? As I understand the sequence of events, the initial complaint, Claim 1, pled a violation of the Supremacy Clause. Based upon Supreme Court precedent, there may be issues with that. But your challenge to that thereafter in the pleadings was that these plaintiffs may not be the right people to bring suit. It wasn't that. They never actually brought a cause of action. Do you believe that their invocation of the court's equity powers in their initial complaint was sufficient to plead a cause of action? We do not, Your Honor. So we think that Armstrong is clear that there's no implied private right of action in the FDIA. So no, we think that they do not have standing because they have to have the private right of action to bring this action altogether, Your Honor. And largely that's based on the language of 12 U.S.C. 1831d, which very clearly has a private right of action, and it does not belong to the banks. It belongs to the borrowers against the banks. But doesn't that also distinguish Armstrong? Because Armstrong, I believe, was looking at the Medicaid Act, and it had separate enforcement provisions that you argue here I think are more analogous to the FDIC as an enforcer. But this statute does provide for a lot of the persons who are receiving the loans, but it at least affords a private cause of action. Doesn't that put this maybe in different footing than Armstrong? It does not, Your Honor, because it expresses one private right of action. It doesn't express it for the banks. So the expression of one means the exclusion of all the others, and that's why it's different. And as the court alluded to, the FDIC enforces the FDIA. They have the power to sue and be sued, and they can promulgate rules. They can issue interpretive letters. And we believe they could sue the state to the extent that they were to enforce laws that were contrary to federal law. So we think, one, 1831D includes a cause of action, but it doesn't belong to the banks. And, two, the FDIC can enforce the FDIA. How does Ex Parte Young and equitable relief fit into that? So Ex Parte Young fits into that, Your Honor. In the analysis of whether you, first you have to have an implied right of action before you can assert a claim under Ex Parte Young, I think this is a developing trend in the jurisprudence where, after Armstrong, you see more and more courts are winding back the prior right of action. But Armstrong itself recognizes Ex Parte Young, and in that case, the plaintiffs were suing to enjoin a state law that they believed was in violation, and the court didn't save that claim based on Ex Parte Young. So I think the appropriate reading is Ex Parte Young allows for equitable claims. It's an exception to sovereign immunity under certain circumstances, but Armstrong is clear the statute still has to have an implied or an explicit right of action before you can sue under it, and they don't have that here. So turning to my first point, I wanted to talk about the district court's interpretation and how it's not actually supported by the language used in the opt-out. The court noted the challenging structure of the opt-out, but nonetheless applied the plain meaning without reconciling meaningful variations between the preemption provision itself, which has a clear focus on the bank's location, versus the opt-out, which has a clear focus on where the loan itself is made. But Title 12 is pretty clear on that it's lender-focused. I mean, it seems that we can just discern a lender-focused approach here by looking at the statutory scheme. I don't think you can, Your Honor. So I think certainly the statute does say that banks make loans in some circumstances. It also frequently uses the word made, which, again, that's what the opt-out uses. It talks about where the loan itself is made. I'd also point out that in Title 12 it mentions how banks can make a contract, but at the end of the day, I don't think anyone would dispute that a bank cannot make a contract without another party. They can't make it by themselves. So I think the reason why the logic breaks down in this context is that a loan isn't just a widget that a bank makes, and they put it on a shelf, and then some borrower comes along and buys it. The loan itself never comes into existence until the borrower utters the words of acceptance. And so under the modern rule, when there's an interstate contract and one party's in one state and one party's in the other, it's made in both states. Under the traditional rule, where the words of acceptance are uttered is where the  I understand your argument. My question was more about your reliance on meaningful variation and how to receive your argument in light of the statutory scheme itself not seeming very variable. It seems quite consistent. That was what I was trying to ask. I think the meaningful variation canon comes into play, Your Honor, specifically when you're looking at data itself. So you have the interest rates based on where the bank is located, and then Section 525. I think the canon of meaningful variation is most valuable when you're looking at a specific law that was passed rather than reaching deep into a corpus juris that could be promulgated over 50 years of acts of Congress. But when you look at data as it was passed in 1980, it went from a very clear bank focus to a focus on where the loan itself is made. And that's because the court should consider the loan being made both where the borrower is and where the lender is, because that's consistent with federal jurisprudence. Well, the banks say your theory has shifted a little bit on that now to this two-state theory. So how do you respond to that? I don't think that's accurate, Your Honor. Obviously, the state was being sued in a preliminary injunction where the banks were suing us saying that the borrower is irrelevant. Obviously, Colorado has a strong interest in protecting its borrowers and its state. But I think it's entirely consistent that despite having a focus on the borrower, we've never said that a loan made by a bank in the state, by a bank located in Colorado, wasn't also made in Colorado. It's consistent with the territorial application of the UCCC. Moreover, I think if there's any doubt whether or not we were focusing on both where the borrower is and the lender is, we made that point clear in the actual preliminary injunction hearing. It's throughout the record and the judge recognized that in his actual order. Well, where is the borrower located? Can you help me understand Colorado's theory? Does it require someone to be a Colorado resident or would it apply to someone who's merely passing through Colorado but may stop to sign loan paperwork? How's the bank to know whether or not the person is in Colorado if that's meaningful under the interpretation of DITA? So there's a few questions there I want to unpack, Your Honor. So the first one is under state law, how would Colorado view the borrower just passing through? So I think the territorial application of Colorado's UCCC is pretty clear. You have to be a resident of the state who's physically present in the state of Colorado at the time the loan is made. So if you're a Colorado resident and you're in Utah when you make that loan, Colorado UCCC doesn't apply. So Colorado's law is arguably narrower than the interpretation of the opt-out. With respect to where a borrower is for the purposes of the opt-out, wherever they are physically present at the time they accept it, accept the loan, is where the loan itself is made. And to your third question, Your Honor, is how are the banks going to actually facilitate this? Well, first of all, they can just make it part of the contract, and they frequently do make that part of the contract. So if you look at some of the contracts that they proposed in the appellate record, it's around pages 286 to 320, and there's a handful of them. They frequently reference which residents their loans are from. There's even one instance for the Nordstrom credit card where they require individuals living in U.S. territory to apply in person in one of the 50 states because they want to do it remotely. One of the applications, which I believe is at page 286, talks about if you're submitting this application via your phone, your mobile phone, you can send to them using your mobile phone to identify you and prevent fraud. So obviously they have technical ways to do it on top of contractual provisions where you can just ask them, and they have to tell you. And if they don't, that's a factual issue that can be resolved by the courts later in an action. But they certainly can do it. There's sophisticated entities that do this sort of thing all the time, Your Honor. Part of the court's analysis hung on what it said was the common parlance. Nobody thinks of themselves as making a loan when, you know, they borrow money from a family member. But that's not actually what DITA hinges on. DITA hinges on where the loan is made. So a more precise rhetorical question would be to ask, does TAB Bank, a Utah bank, make loans in the state of Colorado? And the natural follow-up to that question isn't, where does the bank perform its three non-ministerial functions? The natural follow-up to that question is, well, who are they lending to and where are they located? If TAB Bank is in Utah and they are lending to a resident in Colorado, I think in common parlance everyone would say, yes, they are making loans in Colorado. And that specific loan itself is made in the state of Colorado. The court also pointed out that Congress could have drafted a borrower focus if it wanted to, but that ignores the fact that a loan doesn't exist without two parties. And so the use of the word loan, we posit, does actually have both a focus on where the bank is and where the borrower is. With regards to the bank's arguments, for the most part they rely on legislative history from various bills that don't actually apply to DITA itself. And when it comes to the legislative history they cite for DITA, they are actually mostly citing to legislative history that focuses on the preemption provision, which clearly had a focus on both the interest, the federal discount rate plus 1 percent, as well as the ability to export interest rates. However, if you look at the legislative history that Colorado cited to, which we think we can resolve this on the plain language, but if you look at legislative history, with respect to the opt-out, there was a focus on the ability of states to reassert their usury laws if they decide to reject the principles of DITA, which is exactly what Colorado has done here. Could you better explain, or at least better explain to me your status quo argument? I wasn't really sure. Yes, Your Honor. So essentially what we're saying there is that you have the DITA and the National Bank Act. So for federally chartered banks they can preempt state laws based on the National Bank Act. DITA gave the same power to state charter banks. If you don't have DITA or the National Bank Act, the status quo is you have to comply with the laws of the state. So the banks in Colorado here have conflict of laws that say if you're going to lend to a resident who's in Colorado, our laws apply. And when that's been challenged in the past, those have been uniformly held constitutional. The only reason why the banks are in a different situation here is because they have a federal statute preempting state law. So naturally, if Colorado is opting out of that federal law, you should return us to that state where if you don't have DITA, you must comply with state law. And that's exactly what Colorado did here. But the banks want to still avail themselves to the ability to export interest rates, which is a power they seem to concede they did not have before DITA because they mentioned how the interstate loan market didn't exist until many years following DITA. And I see that I'm running low on time. I'd like to reserve the remaining time for rebuttal if there's no more questions. Thank you, Your  Good morning, Your Honors. And may it please the Court, David Gossett for the Plaintiffs at Police. As the District Court correctly held, when Colorado opted out of DITMCA, it obtained the right to limit the interest rates that the banks it charters may charge. But it did not obtain the right to limit the rates that out-of-state banks may charge when lending to Colorado borrowers. That's clear from the text of DITMCA, from the statute's history, from the use of made in other federal banking statutes, relevant case law, and the regulatory interpretations of at least three different regulatory agencies. Counsel, how do you respond to Colorado's meaningful variation argument if we're understanding it to just be looking at 521 and 525? Several ways, Your Honor. For starters, I think that the canon of meaningful variation is defeasible. And in this case, I think the bottom line is that it is defeased. There is no distinction that the Court needs to draw between the word made in Section 525 and the word locate in Section 521. That comes from looking at the way the statutes were constructed. It comes from the purposes of the statute. And it comes from the way the word made is used in Section 525, which is referring to the period of time during which loans would not be, would be subject to the 521 rule. So I think that an attempt to differentiate between made and located is a fool's errand in this instance. That said, I think that both words essentially mean the same thing, and in this context. And let's talk, let's focus on made, because that's obviously the important one for the purposes of Section 525. And the bottom line is that banks make loans. If I were to ask my colleague, Ms. Brandris, if she took out a loan today from a bank officer, Mr. Swift, if I asked Ms. Brandris, did you make a loan today, she would say, no, I got a loan. If I asked Mr. Swift, did he make a loan today, he would say he made a loan. And that's just common English. It's the way the word is used, as Judge Domenico recognized. It's also the way the word made is used throughout Title 12 of the banking laws. And it's the way the word made is used in the Gramm-Leach-Bliley Act, which the Eighth Circuit in the Jessup case interpreted similarly to be about where the bank is making the loan. Why is it not a fair interpretation of that word to say completed or finished? The loan is made. Oh, we have an existing loan then. And from that, that it's both the borrower and the lender who make the loan. If the loan – well, I think the temporal nature of the loan goes to the fact that this is an effectivity provision, but I'm not sure, Your Honor, what it would mean for – in the context how that would affect where the loan is – was made. That goes to this notion that the state has that the loan is made in two separate places, both where it is made by the bank and where it's received by the lender. And that's – as Judge Federico's questions led to, it's very hard to figure out where a loan would be made in that circumstance. I mean, because borrowers move, what happens when the borrower who has a Colorado – purchases something in Utah, what rate applies to that? The bottom line is that throughout all of these cases and all of these sort of regulatory interpretations, what we go back to is the focus on where the bank was that is making the loan. My friend on the other side talked about the non-ministerial functions test. And I think it's important to understand that that's only really going to essentially edge cases. I mean, the bottom line rule, and this is what the Supreme Court held in the Marquette decision, is that when the National Bank of Omaha is making a loan, it's making that loan in Omaha, in Nebraska, even if it's lending to a borrower in Minnesota. You slide back and forth between make and made throughout the brief, and you're doing it now. It's not the same word. The statute's written the way the statute's written. Okay, I will focus on the word made. This is a separate point, and this is, I think, where it's important to focus on the fact that Section 525 is labeled effective date, and it's talking about that 521 only applies with respect to loans made in any state during the period between the beginning on April 1, 1980 and ending on the date when the state opts out. So that made in that context, the past participle there, has to do with the fact that the opt-out still applies to a loan that was made before the state opts out. That's what Congress was trying to ensure by using the past tense here, is that if a state opts out and the opt-out applies to the kind of loan, which we can return to in a second, a loan that was made before the state opts out and a loan that was issued at a higher interest rate before the opt-out is still valid, and the rate for that loan can still be charged because the opt-out hadn't yet happened. So that's why they use the past tense, and it's why we jump back and forth between made and make. It's also the litany of maids that we point to in Title 12 and the Glam Leach Lively Act. There were both, but to be clear, the Eighth Circuit's decision in Jessup involves the word made as well. Can I take a step back, though, and focus the Court on the first sentence of Section 521, which I think is the most important thing here, which is that the opt-out is in order to prevent discrimination against the state chartered insured depository institutions. The state's argument here is all based on the theory that what Congress was doing in Didmico was consumer protection. It was not. Congress was focused on the dichotomy between the rates that state chartered banks could lend at and national banks could lend at. That's what they were focused on, and they said, we're going to get rid of that dichotomy. We're going to let an Arkansas state bank lend at the same rate as an Arkansas national bank. But because that Arkansas state bank is a creature of the Arkansas government, we're going to let them, if they want to, reassert control over that bank. How does that reading square with the history that was presented to us in the briefs about the state chartered banks becoming or having problems competing in the marketplace because the federal rate at the time before DIDMCA was passed, it started to go up so high during a high inflationary environment? In other words, if it were true that Congress only wanted to allow states to regulate state chartered banks, no state would ever opt out because the state chartered banks would always have trouble competing in the marketplace, right? Wrong, but for two reasons. The first is that the time when DIDMCA, D-I-D-M-C-A, everyone calls it different things. I think the current standard is DIDMCA, but it doesn't matter. At the time when DIDMCA was enacted, the time when the Brock Act was enacted, the time when the borrower's relief was enacted, these were a moment in time when the federal reserve rate was very high, and so therefore banks couldn't lend successfully at any rate in a state like Arkansas, which had a 10 percent cap. So it really was about allowing Arkansas banks to lend in Arkansas. And importantly, those earlier two statutes both raised the limit on national banks, too. They raised the limit on national banks to 5 percent over the discount rate, and then in parallel raised the limit on state chartered banks to 5 percent over. But the second response to Your Honor's question, Judge Federico, is that in the initial aftermath of DIDMCA, seven states opted out, and six states minus Puerto Rico also opted back in, because in the end, this law doesn't do what the state thinks it does. It allows a state to regulate its banks. It allows the state of Colorado to say that although a Colorado national bank can export the Colorado interest rate into Arkansas, which still has a lower interest rate cap, a Colorado state chartered bank cannot. So they are insisting that the Colorado state chartered bank has to follow that rule, the Colorado caps, in the state, outside of the state. But they're not addressing, and they cannot address, whether the Utah state bank can lend at Utah's rates, because that's Utah's right. It's not Colorado's right to regulate that. What is it about the statutory text that supports what you just said? That the focus is not on the Utah, controlling what the Utah banks can do. I would focus on the discrimination against state chartered insured institutions. That the purpose of the act. Okay. So the purpose of DIDMCA as not being focused on consumer protection is your position. That's how we should interpret the statute and the text. Is that anything else? Well, I think that is certainly true. I also think it is true that the use of made throughout the code is parallel. The fact that over the course of the years since then, the government regulatory agencies have fairly consistently, until an earlier brief in this case, so held as well. I'm wondering what your position is on what we should do with the FDIC's conflicting statements. It seems that there may be a statement in the 2020 rule that seems to support Colorado's interpretation. Subsequent statements could be read in support of your position. What do we do with all that? Your Honor, I had a discussion with Judge Domenico about deference to these rules, because our argument there was shortly before Loper-Bright was decided. And what I said to Judge Domenico is none of these are the kinds of rules that would get any deference, kinds of statements that would get deference, even under Chevron, certainly not post that. That said, going back to principles from Skidmore and other cases, earlier in time statements that are issued similar to the point when a rule is issued are traditional, or when a statute was made, traditionally get more deference than later ones. And so I would look back to the 88 in General Counsel's opinion, the 92. The interpretive letter? Yeah, the interpretive letter. And the General Counsel Opinion 11, which is, I guess that's 1998, which was formally adopted by the board of the FDIC, I also think it's important to note that the 2020 rule was not about this. The 2020 rule was the so-called Madden Fix Rule. It had to do with the sale of loans by a bank to someone else. And there is some loose language in there that certainly the State can point to, but I don't think that was never the focus of that rule, whereas many of the earlier ones were very directly focused on DIDMCA and the interpretation of DIDMCA. That said, I think this case, you don't need to go there. I don't think you need to work through the series of FDIC, OCC, OTS statements on this to rule in our favor, nor do I think they would necessarily even help the State. So I do think it's important to return to the basic principle. Counsel, can I return to our discussion about the first sentence in Section 521? And I know you say that my question was wrong, and perhaps you're correct that I'm wrong, but I'd like to at least probe a little more. You seem to be putting a lot of weight on the in order to prevent discrimination against, but who in that context of the statute is doing the discriminating? If I'm supposed to read that language to say that this is the whole purpose of DIDMCA, and 521 and 525 should be read together to allow states to return to their traditional police power, power over usury laws, if that's all true, then who would be doing the discrimination against State chartered banks that Congress was trying to protect? What does that mean, prevent discrimination? I don't think it's meant to imply a discrimination in the sense of an affirmative action by a person. I think what it means is in order to prevent State chartered banks from being able to lend in the same way that nationally chartered banks can lend. That's what it means. It's that nationally chartered banks can lend at a certain rate and State chartered banks cannot. I see my time is up. May I ask one last sentence on that, which is that it's important to remember on this, the consumer protection focus that the State wants to have here, that the national banks will still and can still lend into Colorado at whatever rates are allowed in their home states, despite the State's opt-out. So the opt-out really does not have any of the effects that the State is trying to have, because all it really is going to do is force State banks to convert to national charters. Thank you, Your Honors. May it please the Court. So one of the statements my friend just made was made and located mean essentially the same thing, but it's only a real big problem in edge cases. First of all, made and located are two different words. If Congress wanted to use located, they would have put located in the opt-out. Second, the problem with the edge case actually shows the absurdity of their position. In the edge cases, specifically, if all three non-ministerial functions are done in different states, there could be a situation where the loan is made under the location test in a fourth state where none of the ministerial functions have actually happened. That is an absurd result that is not contemplated by Section 525. With respect to JSEP, JSEP was a case interpreting a different statute in the National Bank Act, applying Chevron deference to an OCC letter, a different regulator that regulates national banks that's no longer even available. So before Loper-Bright, it wasn't instructive or should not get deference in this case. After Loper-Bright, there's essentially no value in it. Mr. Gossett is also dissecting the opt-out clause to focus only on the second part where it talks about except loans made on this date. It's true that that part talks about specifically what time period of loans an opt-out is effective for, but the operative part of the opt-out is right above the part where he was quoting where it says which states explicitly and by its terms that such state does not want this section to apply with respect to loans made in such state. That is the operative language rather than the language that they're relying on to say that it's purely about the effective date. Finally, Mr. Gossett talked about how Congress's intent wasn't to allow Colorado to tell a Utah bank what to do. If a Utah bank wants to lend to a Kansas bank, a Kansas resident, that's fine. Colorado doesn't care. What Colorado cares about is a Utah bank coming into Colorado and lending to a Colorado borrower at usurious rates. That's not supported by the opt-out, and that's why this Court should reverse the district court. So where in the statute can we find any language that supports that part of the purpose of Congress in passing DIDMCA was consumer protection of state residents? Well, I think, Your Honor, this is talking about usury laws, and if they didn't care about consumer protection, there would be no opt-out. If it was all national parity, it would just be 521 with no 525. The fact that they had 525 was a nod to the fact that the states have always had this police power, and they should be able to have it again if they want to take it back. So Mr. Gossett's argument about the introductory language of 521A, about the preventing discrimination against state charter insured depository institutions, you don't think that is directly linked to the purpose under 525? In fact, I'm hearing you say you find those purposes to be different. The purpose of that introductory clause is why they have the preemption provision. The reason they have the opt-out provision is to allow the states to assert their traditional police powers over usury. So they have different purposes. Thank you, Your Honor. Thank you, counsel, for your arguments. The case is submitted. Counsel are excused. The court will stand in recess until 830 tomorrow morning. Thank you.